In the

# United States Court of Appeals

### For the Seventh Circuit

No. 13-2653

FREDY ARNOLDO SANCHEZ,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals

ARGUED FEBRUARY 24, 2014 — DECIDED JULY 9, 2014

Before FLAUM and ROVNER, *Circuit Judges*, and KENDALL, *District Judge*.*

FLAUM, *Circuit Judge*. Fredy Arnoldo Sanchez seeks review of a Board of Immigration Appeals decision dismissing his appeal of the immigration judge's order of removal. The Board determined that Sanchez was ineligible for cancella-

---

* Of the Northern District of Illinois, sitting by designation.

tion of removal because he failed to prove that he had not been convicted of a crime involving moral turpitude. Because the Board did not properly conduct the three-step inquiry prescribed in *Matter of Silva-Trevino*, 24 I. & N. Dec. 687 (A.G. 2008), we grant Sanchez's petition and remand for further proceedings.

## I. Background

Fredy Arnoldo Sanchez, a citizen and native of El Salvador, entered the United States without inspection in 1989. Sanchez is now forty-seven, is married to a lawful permanent resident, and has four children, all of whom are U.S. citizens. He lives in Indianapolis, Indiana.

In either 1989 or 1994 (the parties dispute this, but it does not matter for this appeal), Sanchez filed an application for asylum and withholding of removal. In 2002, he filed an additional application for special rule cancellation of removal under § 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub. L. No. 105-100, 111 Stat. 2160, as amended by Pub. L. No. 105-139, 111 Stat. 2644 (1997). After an interview, the Department of Homeland Security referred Sanchez's applications to an immigration judge (IJ). He was charged with removability under § 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without admission or parole.

Sanchez conceded his removability during his initial appearance before the IJ in August 2006. At his next hearing, in December 2007, Sanchez submitted a renewed application for NACARA special rule cancellation of removal along with an application for cancellation of removal under INA

§ 240A(b), 8 U.S.C. § 1229b(b), based on exceptional hardship to his U.S. citizen children. While his removal proceedings were pending, the government submitted evidence that Sanchez was not eligible for NACARA relief because he had assisted in the persecution of others while serving in the El Salvador military. Sanchez asked for a continuance to respond to the government's allegations.

At Sanchez's next hearing, in August 2009, a new issue arose. Sanchez told the IJ that he had been arrested in Indiana in September 2008 "for leaving the scene of an accident where serious bodily injury occurred." Apparently hearing this information for the first time, the government argued that Sanchez's conduct constituted a crime involving moral turpitude. An alien convicted of a crime involving moral turpitude (a CIMT, for short) is statutorily ineligible for cancellation of removal under either the INA or NACARA, subject to exceptions not at issue here. *See* 8 U.S.C. § 1182(a)(2)(A)(i) ("any alien convicted of, or who admits having committed, or who admits committing acts that constitute the essential elements of … a crime involving moral turpitude" is inadmissible, subject to exceptions); *id.* § 1101(f)(3) (a person cannot show good moral character if she has been convicted of a crime of moral turpitude during the relevant period); *id.* § 1229b(b)(1)(C) (the Attorney General may cancel the removal of a nonpermanent resident who "has not been convicted of an offense under section 1182(a)(2)"). The INA does not define the term. However, the Board of Immigration Appeals and our circuit have described a CIMT as "conduct that shocks the public conscience as being 'inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.'" *Lagunas-Salgado v.*

*Holder*, 584 F.3d 707, 710 (7th Cir. 2009) (quoting *In re Solon*, 24 I. & N. Dec. 239, 240 (B.I.A. 2007)).

The IJ continued the proceedings again to allow Sanchez to provide more information about his Indiana arrest. Sanchez then submitted a "case chronology printout" (a docket sheet) from the Criminal Division of the Marion Superior Court. The printout states that in October 2009, Sanchez pleaded guilty to one count of a violation of Ind. Code § 9-26-1-8, "Failure to stop and remain at scene of accident resulting in injury or death." That provision holds that "[a] person who knowingly or intentionally fails to stop or comply with section 1(1) or 1(2) of this chapter after causing injury to a person commits … a Class D felony if … the accident involves serious bodily injury to a person." The referenced section, Ind. Code § 9-26-1-1, "Duties of driver of vehicle involved in accident resulting in injury, death, or entrapment," provides:

> Except as provided in section 1.5 of this chapter[1], the driver of a motor vehicle involved in an accident that results in the injury or death of a person or the entrapment of a person in a vehicle shall do the following:
>
> (1) Immediately stop the driver's motor vehicle at the scene of the accident or as close to the accident as possible in a manner that does not obstruct traffic more than is necessary.

---

[1] Ind. Code § 9-26-1-1.5 concerns the responsibilities of a passenger when the driver is physically incapacitated.

(2) Immediately return to and remain at the scene of the accident until the driver does the following:

(A) Gives the driver's name and address and the registration number of the motor vehicle the driver was driving.

(B) Upon request, exhibits the driver's license of the driver to the following:

(i) The person struck.

(ii) The driver or occupant of or person attending each vehicle involved in the accident.

(C) Subject to section 1.5(a) of this chapter, determines the need for and renders reasonable assistance to each person injured or entrapped in the accident, including the removal of, or the making of arrangements for the removal of:

(i) each injured person from the scene of the accident to a physician or hospital for medical treatment; and

(ii) each entrapped person from the vehicle in which the person is entrapped.

(3) Subject to section 1.5(b) of this chapter, immediately give notice of the accident by the quickest means of communication to one (1) of the following:

(A) The local police department, if the accident occurs within a municipality.

> (B) The office of the county sheriff or the nearest state police post, if the accident occurs outside a municipality.

The case printout indicates that Sanchez was charged with a Class D felony because the incident involved serious bodily injury, although the Marion Superior Court ultimately entered the conviction as a misdemeanor.[2] The court gave Sanchez a sentence of 365 days in jail with 363 days suspended. He received 363 days of probation.

Sanchez also submitted his plea agreement to the immigration court. It states that he agreed to plead guilty to "Count I Failure to Stop After Accident Resulting In Serious Bodily Injury Class D Felony." In addition, Sanchez provided a personal affidavit explaining the circumstances surrounding the accident. It recounts that Sanchez was driving at night on a road without any lights, that it was raining heavily, and that there was a lot of fog. He "heard a noise, which was an impact on [his] car." Unsure whether he could stop safely in traffic, and believing that he had merely hit "a post or a small object," Sanchez continued driving. The affidavit states that he only became aware that he had hit a person when police officers arrived at his residence the next day and told him.

During the final hearing, in September 2011, the IJ examined the documents and questioned Sanchez. The IJ then orally denied his applications for cancellation of removal,

---

[2] This was done pursuant to Ind. Code § 35-50-2-7(c), which holds that "if a person has committed a Class D felony … the court may enter judgment of conviction of a Class A misdemeanor and sentence accordingly."

followed by a written order. Defining a CIMT as a crime "viewed as a reprehensible act" and having "some requirement of *mens rea*," the IJ reasoned that because "the record reflects that the respondent pled guilty to knowingly or intentionally failing to stop [after] causing injury to a person," Sanchez's offense was a CIMT "under the categorical approach." The IJ ordered Sanchez's removal to El Salvador.

Sanchez appealed the IJ's decision to the Board of Immigration Appeals. The Board began its analysis by emphasizing that under 8 C.F.R. § 1240.8(d), "[t]he respondent has the burden of establishing that he is eligible for any requested benefit," and "[i]f the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the respondent shall have the burden of proving by a preponderance of the evidence that such grounds do not apply." The Board then stated that it "agree[d] with the Immigration Judge that the respondent did not meet his burden of proving … that his criminal conviction is not a CIMT."

The Board explained its reasoning in three sentences. In the first, it acknowledged Sanchez's argument, made in his briefing, that "there is a realistic probability that the statute has been applied to offenses that both are and are not CIMT[s]." But the Board next concluded that "the respondent has not established that he was not convicted under a portion of the statute that does not qualify as a CIMT," because "[a]side from the 'case chronology' printout from the Indiana court, there is no other evidence regarding his conviction." Accordingly, the Board dismissed Sanchez's appeal.

## II. Discussion

The classification of a crime as one of moral turpitude is a question of law that we have jurisdiction to review. 8 U.S.C. § 1252(a)(2)(D). The parties agree that because the Board issued its own free-standing opinion, "rather than adopting or merely supplementing the opinion of the IJ," we review the Board's opinion. *Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007). Because the Board is explicating an undefined term in a statute that the agency is entrusted to administer, under certain circumstances we would defer to its determination pursuant to *Chevron*. *Mata-Guerrero v. Holder*, 627 F.3d 256, 259 (7th Cir. 2010). But where—as here—we are reviewing a non-precedential Board decision, issued by a single member, which does not rely on agency precedent, the Board's CIMT determination can receive only *Skidmore* deference. *Arobelidze v. Holder*, 653 F.3d 513, 520 (7th Cir. 2011). This means that the Board's decision is "entitled to respect—but only to the extent that it has the power to persuade." *Id.* (quotation marks and brackets omitted).

Here, the Board's decision lacks persuasive power because the Board did not use the proper analytical methodology. For this reason, we vacate its decision and remand.

In *Matter of Silva-Trevino*, 24 I. & N. Dec. 687 (A.G. 2008), the Attorney General established a three-step framework for immigration judges and the Board to use to determine whether an alien's conviction qualifies as a CIMT.[3] At the

---

[3] The Attorney General's decision in *Silva-Trevino* describes the inquiry as being comprised of two "stages": an initial stage where the adjudicator evaluates the statute on a categorical basis, and a second stage in which the adjudicator first examines the record of conviction and then, if necessary, considers additional evidence. *See* 24 I. & N. Dec. at 698–99,

first step, the adjudicator is to evaluate the criminal statute on a categorical basis and "determine whether there is a 'realistic probability, not a theoretical possibility,' that the State or Federal criminal statute pursuant to which the alien was convicted would be applied to reach conduct that does not involve moral turpitude." *Id.* at 689–90 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). If it appears that the government in question would apply its criminal statute to reach both turpitudinous and non-turpitudinous acts—perhaps because the statute is divisible, but also because the statute could realistically cover a wide range of conduct—the adjudicator is instructed to proceed to step two. At this point, the adjudicator should examine the alien's record of conviction—including the charging document, the judgment of conviction, jury instructions, a signed guilty plea, or a plea transcript—to determine which part of the statute the alien's conviction falls under (in the case of a divisible statute), or whether the alien's conduct otherwise "evidences a crime that in fact involved moral turpitude." *Id.* at 690.

The record of conviction may also fail to resolve the matter. If that's the case, *Silva-Trevino* instructs the adjudicator to proceed to a third step and consider evidence beyond the record of conviction "if doing so is necessary and appropriate to ensure proper application of the [INA]'s moral turpitude provisions." *Id.* at 699. As the Attorney General explained, expanding the CIMT inquiry beyond the formal record of conviction "result[s] in more accurate determinations of who falls within the scope" of the INA's moral turpi-

703 n.4. However, our court and others have described the analysis as comprising three steps. *See, e.g.*, *Mata-Guerrero*, 627 F.3d at 260; *Olivas-Motta v. Holder*, 746 F.3d 907, 910–11 (9th Cir. 2013).

tude provisions, and "better accord[s] with the statute's de-
mands for individualized adjudications." *Id.* at 702. The At-
torney General also reasoned that the alternative—limiting
the inquiry to the wording of the criminal statute and what-
ever information the government happens to include in its
charging documents and other records—"would be in ten-
sion with the goals of the immigration act" and "would also
unfairly apply immigration penalties to aliens whose indi-
vidual crimes did not, in actuality, involve moral turpitude."
*Mata-Guerrero*, 627 F.3d at 261 (citing *Silva-Trevino*, 24 I. & N.
Dec. at 700). "In other words, the ultimate purpose of [the
CIMT] analysis is to look at the actual crime committed by
the individual alien." *Id.*

The individualized inquiry mandated by *Silva-Trevino* is
consistent with our circuit's precedent. *See Ali v. Mukasey*,
521 F.3d 737, 743 (7th Cir. 2008) (deferring to *Matter of Ba-
baisakov*, 24 I. & N. Dec. 306 (B.I.A. 2007), and holding that
"when deciding how to classify convictions under criteria
that go beyond the criminal charge—such as … whether the
crime is one of 'moral turpitude', the agency has the discre-
tion to consider evidence beyond the charging papers and
judgment of conviction"). Accordingly, we have deferred to
the Attorney General's decision. *Mata-Guerrero*, 627 F.3d at
260; *see also Marin-Rodriguez v. Holder*, 710 F.3d 734, 738 (7th
Cir. 2013). The Attorney General's determination of this is-
sue of law is therefore controlling, *see* 8 U.S.C. § 1103(a)(1),
and "there is no longer any question regarding which meth-
odology should be used to determine whether a crime is or

is not a crime of moral turpitude." *Mata-Guerrero*, 627 F.3d at 260.[4]

The Board cited *Silva-Trevino* in passing. But it did not properly employ its methodology. Nowhere in its discussion does the Board state a conclusion—required at *Silva-Trevino*'s first step—that some portion of the conduct described in Ind. Code §§ 9-26-1-8 and 9-26-1-1 categorically qualifies as a CIMT. Similarly, the Board did not state what conclusion, if any, it drew from Sanchez's record of conviction; it merely mentioned (incorrectly) that Sanchez's case chronology printout was the only evidence of his conviction. Given the Board's ultimate conclusion, it could be that the Board found the case chronology printout inconclusive. But if that was the case, then the Board should have proceeded to the third *Silva-Trevino* step and decided whether it was "necessary or appropriate," in order to "resolve accurately the moral turpitude question," to consider evidence beyond the docket sheet—for instance, by considering Sanchez's affidavit, or else remanding to the IJ to hear additional evidence. *Silva-Trevino*, 24 I. & N. Dec. at 704.

---

[4] We note that several of our sister circuits have rejected the *Silva-Trevino* methodology as contrary to the unambiguous language in the INA. *See Silva-Trevino v. Holder*, 742 F.3d 197, 200 (5th Cir. 2014); *Olivas-Motta*, 746 F.3d at 916; *Prudencio v. Holder*, 669 F.3d 472, 482 (4th Cir. 2012); *Fajardo v. Attorney Gen.*, 659 F.3d 1303, 1309–10 (11th Cir. 2011); *Jean-Louis v. Attorney Gen.*, 582 F.3d 462, 473 (3d Cir. 2009). *But see Bobadilla v. Holder*, 679 F.3d 1052, 1057 (8th Cir. 2012) (deferring to *Silva-Trevino*). In his opening brief, Sanchez asked us to reconsider *Ali* and *Mata-Guerrero* and join those circuits in holding that the IJ and the Board are confined to the record of conviction in determining whether an alien has been convicted of a CIMT. However, Sanchez abandoned this request in his reply brief, and we will not revisit our deference to *Silva-Trevino* in this case.

True, the IJ and the Board retain substantial discretion in making the decision to consider evidence outside the formal record of conviction. *Mata-Guerrero v. Holder*, 639 F.3d 276, 277 (7th Cir. 2011). However, the adjudicator must still exercise that discretion: The Board should have explained its determination that additional evidence was not necessary or appropriate to resolve the moral turpitude question, if that was indeed what the Board thought. *See Silva-Trevino*, 24 I. & N. Dec. at 704. But if anything, the Board's reasoning suggests that additional evidence *was* necessary.

Rather than reaching conclusions at each step of the *Silva-Trevino* analysis, the Board's decision rests on a burden-of-proof rationale. Under 8 C.F.R. § 1240.8(d), the alien has the burden to establish her eligibility for any form of relief from removal. And "[i]f the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply." 8 C.F.R. § 1240.8(d).[5] The Board appears to have reasoned that because Sanchez had the burden to show that he had not been convicted of a CIMT, and because the record of conviction did not shed light on the matter, Sanchez lost by default.

However, the Board improperly applied 8 C.F.R. § 1240.8(d) to the inquiry at issue. The Attorney General has

---

[5] Congress embraced 8 C.F.R. § 1240.8(d)'s standard in § 101(d) of the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 304 (2005), codified at 8 U.S.C. § 1229a(c)(4). The parties do not dispute that because Sanchez filed his application for NACARA special rule cancellation of removal in 2002—before the REAL ID Act's passage—8 U.S.C. § 1229a(c)(4) does not apply in his proceedings.

instructed that in inadmissibility cases like Sanchez's, "[i]t would be the alien's burden, in the first stage of the inquiry, to show that the criminal statute under which he had been convicted has actually been applied to conduct that did not involve moral turpitude." *Silva-Trevino*, 24 I. & N. Dec. at 703 n.4. We may assume (without deciding) that at least some portion of Ind. Code § 9-26-1-8 could amount to a CIMT, as willfully leaving the scene of an accident—knowing that someone has been hurt—"is intrinsically wrong" and "reflects an intentional attempt to evade responsibility." *Garcia-Maldonado v. Gonzales*, 491 F.3d 284, 290 (5th Cir. 2007).

But in his brief to the Board, Sanchez presented case law establishing that drivers can be convicted under Ind. Code § 9-26-1-8 for violating *any* of the duties listed in § 9-26-1-1, not just for committing a hit-and-run. *See Barton v. State*, 936 N.E.2d 842, 848–49 (Ind. Ct. App. 2010); *Barber v. State*, 863 N.E.2d 1199, 1205–06 (Ind. Ct. App. 2007). Sanchez also presented cases in which Indiana courts upheld convictions under § 9-26-1-8 where the driver mistakenly thought the authorities had his identifying information, *see Barton*, 936 N.E.2d at 854; where the driver called 911 and left her vehicle at the scene but did not stay at the scene herself, *see Nield v. State*, 677 N.E.2d 79, 80–81 (Ind. Ct. App. 1997); and where the driver, having called 911, returned to the scene after fourteen minutes, *see Fleming v. State*, No. 64A03-0703-CR-134, 2008 WL 113910, at *1 (Ind. Ct. App. Jan. 11, 2008). This showing should be sufficient to carry Sanchez's burden of demonstrating that the statute has a realistic probability of being applied to conduct that is not morally turpitudinous— or, put another way, that moral turpitude does not "necessarily inhere[] in the cases that have a 'realistic probability'

of being prosecuted." *Silva-Trevino*, 24 I. & N. Dec. at 705. In any event, the Board did not find to the contrary.

Instead, the Board moved straight to the second *Silva-Trevino* step and found that Sanchez "did not meet his burden of proving … that his criminal conviction is not a CIMT" because he "has not established that he was not convicted under a portion of the statute that does not qualify." Again, it seems that the Board reached this conclusion because it found the case chronology printout inconclusive regarding Sanchez's charge. But if the record of conviction does not answer the question, it does not follow that the alien has failed to carry his burden and the inquiry is over. It only means that the adjudicator should exercise its discretion to consider additional evidence (or else explain why it declined to do so). Only if the matter is *still* inconclusive after that step— perhaps because the evidence is closely balanced, or the adjudicator finds that the alien's account lacks credibility—will the burden of proof come into play. But just because Sanchez may ultimately lose in the event of a tie does not mean that the Board can end the inquiry early.[6]

---

[6] For this reason, our understanding of 8 C.F.R. § 1240.8(d)'s operation is consistent with our sister circuits' decisions in *Young v. Holder*, 697 F.3d 976, 988–90 (9th Cir. 2012) (en banc), *Salem v. Holder*, 647 F.3d 111, 115–16 (4th Cir. 2011), and *Garcia v. Holder*, 584 F.3d 1288, 1290 (10th Cir. 2009), which all held that an alien could not satisfy his burden to demonstrate eligibility for relief by presenting an inconclusive record of conviction.

In *Young* and *Salem*, the aliens were seeking cancellation of removal, and the government argued that they had been convicted of aggravated felonies. (Like a CIMT, an aggravated felony renders an alien ineligible for cancellation of removal. 8 U.S.C. §§ 1229b(a)(3), 1229b(b)(1)(c).) However, when determining whether a particular crime is an aggravated felony, the Ninth Circuit conducts a categorical analysis of the statute and, if

Because the Board did not properly apply the *Silva-Trevino* framework, we grant Sanchez's petition and remand for further proceedings. *See Mata-Guerrero*, 627 F.3d at 257 (granting alien's petition for review "[b]ecause the Attorney General's determination of the appropriate methodology is controlling, and because the Board did not use that methodology in Mata-Guerrero's case"). We do not reach the question whether any portion of Ind. Code § 9-26-1-8 categorically qualifies as a CIMT. But the Board should consider this threshold issue more thoroughly on remand.

As noted above, both the Board and our court have described CIMTs as involving conduct that is "inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." We have described the distinction between CIMTs and other crimes as one between "acts that are seen as ethi-

---

necessary, a "modified categorical" analysis of the record of conviction; the court's methodology does not call for the equivalent of *Silva-Trevino*'s third step. *Young*, 697 F.3d at 982–84. And although the Fourth Circuit, in *Salem*, reserved the question of whether it was appropriate to move past the modified categorical stage in the relief-from-removal context, the alien in that case did not attempt to present evidence outside the record of conviction—so the Fourth Circuit's analysis was effectively at an end. 647 F.3d at 119. The Tenth Circuit's *Garcia* decision, like ours, arose in the CIMT context. But the Tenth Circuit has not embraced *Silva-Trevino*'s third step. *See Efagene v. Holder*, 642 F.3d 918, 926 n.5 (10th Cir. 2011) (declining to address whether the *Silva-Trevino* framework is a reasonable interpretation of the INA); *Dzerekey v. Holder*, No. 13-9570, 2014 WL 1509207, at *4 n.6 (10th Cir. Apr. 18, 2014) (the circuit has still neither adopted nor rejected *Silva-Trevino*). Thus, we, the Fourth, the Ninth, and the Tenth Circuits all agree that if the analysis has run its course and the answer is still unclear, the alien loses by default. In our case, however, the Board did not go through the full analysis.

cally wrong without any need for legal prohibition (acts
wrong in themselves, or *malum in se*), and those that are ethi-
cally neutral and forbidden only by positive enactment (acts
wrong because they are so decreed, or *malum prohibitum*)."
*Ali*, 521 F.3d at 740. But we have also emphasized that it is "a
question of the offender's evil intent or corruption of the
mind." *Lagunas-Salgado*, 584 F.3d at 710 (quotation marks
omitted).

Sanchez argues that Ind. Code § 9-26-1-1 prescribes a
laundry list of duties required of a driver who is involved in
a serious accident, some of which amount to technical of-
fenses that are merely *malum prohibitum. Cf. Cerezo v.
Mukasey*, 512 F.3d 1163, 1167 (9th Cir. 2008) (examining an
analogous California statute and noting that "[t]he failure to
provide a vehicle registration number [when the driver stops
and provides other identification] is not base, vile and de-
praved; nor does it necessarily evince any willfulness or evil
intent, a requisite element of crimes of moral turpitude").
Though not conceding the point, the government responds
that, at the very least, the portion of § 9-26-1-8 criminalizing
"knowingly or intentionally fail[ing] to stop … after causing
injury" categorically qualifies as a CIMT.

That blanket assertion, however, is debatable. Although
the statute includes a *mens rea* of "knowingly or intentional-
ly," Indiana courts have held that a driver can be convicted
under § 9-26-1-8 absent actual knowledge that an accident
occurred or that a person was injured. *See, e.g., Micinski v.
State*, 487 N.E.2d 150, 153 (Ind. 1986) (construing similar
predecessor statute); *State v. Gradison*, 758 N.E.2d 1008, 1011
(Ind. Ct. App. 2001). The Indiana courts instead reason that
"[w]here conditions were such that the driver *should have*

*known* that an accident occurred or *should have reasonably anticipated* that the accident resulted in injury to a person, the requisite proof of knowledge is present." *Gradison*, 758 N.E.2d at 1011 (emphasis added).

Sanchez argues that this "reasonably should have known" standard is the equivalent of negligence—and further, that negligence is not the equivalent of "evil intent or corruption of the mind" under Board and judicial precedent. *See, e.g.*, *Matter of Perez-Contreras*, 20 I. & N. Dec. 615, 619 (B.I.A. 1992) ("Since there was no intent required for conviction, nor any conscious disregard of a substantial and unjustifiable risk, we find no moral turpitude inherent in the statute."); *Partyka v. Attorney Gen.*, 417 F.3d 408, 414–16 (3d Cir. 2005) (aggravated assault of a law enforcement officer not a CIMT if committed negligently); *Silva-Trevino*, 24 I. & N. Dec. at 706 n.5 (discussing with approval judicial precedents describing CIMTs as crimes involving "reprehensible conduct that is committed intentionally or with some other form of scienter such as willfulness or recklessness"). The upshot of all this is that even if it's established that Sanchez was convicted for "knowingly … failing to stop" (as his plea agreement indicates), this conviction is not necessarily a CIMT. If so, further inquiry into the circumstances of Sanchez's offense—in particular, whether he actually knew that he hit a person—could be "necessary or appropriate to resolve accurately the moral turpitude question." As the Board did not address this argument in dismissing Sanchez's appeal, we ask it to consider the matter on remand.[7]

---

[7] It is possible—though not clear—that the Board was adopting the IJ's analysis on this issue. If so, we also find the IJ's reasoning lacking. The IJ described a CIMT as a crime that has "some requirement of *mens rea*."

### III. Conclusion

We therefore GRANT the petition for review and REMAND the case to the Board of Immigration Appeals for further proceedings consistent with this opinion.

---

That description is overinclusive, as "some requirement of *mens rea*" is broader than evil intent or reckless disregard for others. The IJ further explained that "[w]here a conviction occurs as a result of reckless conduct, the [Board] has generally held that it only constitutes a crime involving moral turpitude where serious bodily injury results." Even assuming that is an accurate summary of the Board's precedent, it may be the case that Indiana courts will convict under Ind. Code § 9-26-1-8 absent a showing of the defendant's recklessness.