In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1797

JUAN CARLOS GARCIA-MARTINEZ,

*Petitioner,*

*v.*

WILLIAM P. BARR, Attorney General of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals
No. A206-274-310

ARGUED OCTOBER 26, 2018 — DECIDED APRIL 16, 2019

Before WOOD, *Chief Judge*, and SYKES and SCUDDER, *Circuit Judges*.

WOOD, *Chief Judge*. The task of identifying a "crime involving moral turpitude" has vexed courts and agencies for decades, if not centuries. "Moral turpitude" tends to be defined very broadly. So, for example, one reads in Black's Law Dictionary (10th ed. 2014), that it is "[c]onduct that is contrary to justice, honesty, or morality; *esp.*, an act that demonstrates depravity." Webster's Third New International Dictionary

defines it as "1: an act or behavior that gravely violates the moral sentiment or accepted moral standards of the community; *esp.*: sexual immorality … ; 2: the morally culpable quality held to be present in some criminal offenses as distinguished from others … ." The Board of Immigration Appeals offers this: "The term 'moral turpitude' generally refers to conduct that is 'inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *Matter of Silva-Trevino*, 26 I. & N. Dec. 826, 833 (BIA 2016) (*Silva-Trevino III*). Each of those definitions leaves a lot of work to be done when particular crimes or specific acts must be characterized.

Nonetheless, there is a rough consensus that the phrase is more than an epithet. The Supreme Court has held that crimes involving fraud, for example, almost always involve moral turpitude. *Jordan v. DeGeorge*, 341 U.S. 223, 232 (1951). By contrast, there is near universal agreement that simple assault is not such a crime. See, *e.g.*, *In re Solon*, 24 I. & N. Dec. 239, 241 (BIA 2007). But when, as in the present case, the court must use a categorical approach for classifying crimes, and only some of the conduct covered by a statute appears to be sufficiently vile, base, immoral, or depraved to deserve the label moral turpitude, it is hard to be sure when or whether the line from ordinary culpability to moral turpitude has been crossed.

A great deal can hang on the proper characterization of an offense, as the case now before us illustrates. In 1998 Juan Carlos Garcia-Martinez pleaded guilty to assault with a deadly weapon in violation of New Jersey law. See N.J.S.A. § 2C:12-1(b)(2). The question here is how that crime affects his immigration status. The Board of Immigration Appeals (the Board)

has found in the past that "assault with a deadly weapon" is a crime of moral turpitude that makes a noncitizen ineligible for cancellation of removal. See *Matter of Logan*, 17 I. & N. Dec. 367, 369 (BIA 1980); 8 U.S.C. § 1229b(b)(1)(C); see also *Pereira v. Sessions*, 138 S. Ct. 2105, 2110 n.1 (2018) ("The Court uses the term 'noncitizen' throughout this opinion to refer to any person who is not a citizen or national of the United States."). But we now know from *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004), that the Board must approach this as a categorical inquiry, not one based on the facts of an individual case. We must therefore consider whether the crime New Jersey has labeled "assault with a deadly weapon" covers only conduct that is properly classified as a crime of moral turpitude, or if on the other hand it sweeps in factual scenarios that are akin to simple assault. If the latter is true, as Garcia-Martinez contends, his crime of conviction is not categorically one of moral turpitude. The Board found that there was no realistic probability that the New Jersey law could be applied to conduct outside the scope of the generic crime. It therefore concluded that Garcia-Martinez's earlier conviction was for a crime involving moral turpitude.

On Garcia-Martinez's petition for review, we conclude that the Board committed several legal errors that may have affected its decision. We thus grant the petition and remand for further proceedings.

**I**

Petitioner Garcia-Martinez, who also has gone under the name Andres Garcia-Martinez, lacks lawful status in the United States. The Department of Homeland Security has charged him as removable on two bases: first, for being present in the United States without being admitted or paroled,

see 8 U.S.C. § 1182(a)(6)(A)(i); and second, for having been convicted of a crime involving moral turpitude, see 8 U.S.C. § 1182(a)(2)(A)(i)(I). The two grounds carry significantly different consequences. Presence without being admitted or paroled—which Garcia-Martinez admits applies to him—is the less severe of the two. Under that ground, he may qualify for discretionary cancellation of removal. See 8 U.S.C. § 1229b(a). That is not possible if the Board correctly found that he has a conviction for a crime of moral turpitude on his record. Should the latter be true, he would be barred from cancellation of removal and adjustment of status. See 8 U.S.C. § 1229b(b)(1)(C). Given Garcia-Martinez's concession, the only question before us is whether the Board correctly found that the New Jersey crime was one of moral turpitude.

Some of the circumstances surrounding Garcia-Martinez's conviction are uncontested. In 1998, he pleaded guilty in New Jersey to a state charge of assault with a deadly weapon. According to his plea colloquy, Garcia-Martinez's role in the assault was minor: he stuck out his foot in order to trip the victim. Once the victim was on the ground, Garcia-Martinez's friends "jumped on [the victim] and started hitting him" and "some of [Garcia-Martinez's] friends punched [the victim], kicked him and struck him." Garcia-Martinez stood by while his friends carried out their assault; he soon left the scene. The New Jersey prosecutor and judge accepted this recitation of the facts as sufficient to convict Garcia-Martinez as both a principal and an accomplice. Neither the prosecutor nor the judge asked about the level of force used by any of the assailants, any weapons used other than fists and feet, or the amount of harm the victim suffered.

At Garcia-Martinez's hearing before the Immigration Judge (IJ), no one suggested that this account of his conviction was incomplete. Instead, both the lawyer from the Department of Homeland Security and Garcia-Martinez focused on whether a New Jersey conviction for assault with a deadly weapon is a crime of moral turpitude when the deadly weapon at issue is the perpetrator's hands or feet—specifically the foot Garcia-Martinez used to trip his victim. The IJ, later affirmed by the Board, did not decide whether the foot for this purpose was deadly. Yet at the same time, both the IJ and the Board found that the record of Garcia-Martinez's crime did not foreclose the possibility that his accomplices used some traditional deadly weapon during the commission of the offense. Relying on that speculation, the Board ruled that there was no realistic probability that New Jersey's crime of assault with a deadly weapon would sweep in conduct beyond the scope of a crime of moral turpitude. On that basis, it concluded that Garcia-Martinez was removable on this ground and thus not eligible for cancellation of removal.

## II

There are several problems with the BIA's resolution of Garcia-Martinez's petition. First, the BIA has never defined what it considers a "deadly weapon" in the context of a crime involving moral turpitude. Second, the record is devoid of evidence that might support the BIA's idea that Garcia-Martinez's accomplices used any conventional weapon—a supposition that appears to have been central to the Board's decision. Third, the BIA misconstrued Garcia-Martinez's argument regarding the factual basis for his plea and decided his case based on an argument first raised outside of the adversarial process.

A

Before addressing the merits, we must clarify the standard of review that applies here. It is important for this purpose to distinguish between a party's burden to raise a point (whether legal or factual) before the Board, and a party's burden of persuasion. Legal issues, including the characterization of a crime as one of moral turpitude, receive plenary review in this court. In order properly to exhaust his remedies, a petitioner has the burden of raising that legal point before the Board, see 8 U.S.C. § 1252(d)(1), but both the Board and this court then decide the question as a matter of law. For factual questions, the petitioner bears the burden of production and persuasion.

While these rules are well established, their application became confused for a time as a result of the Board's decision in *Matter of Silva-Trevino*, 24 I. & N. Dec. 687 (A.G. 2008) (*Silva-Trevino I*). *Silva-Trevino I* established a three-part test for determining when a person has been convicted of a crime of moral turpitude. That test first required the immigration judge to "determine whether there is a realistic probability, not a theoretical possibility, that a State or Federal criminal statute [of conviction] would be applied to reach conduct that does not involve moral turpitude." *Id.* at 698 (internal quotations omitted). If that categorical analysis did not resolve the inquiry, the judge was instructed to proceed to step two, under which the judge would take a "modified categorical" approach and "examine whether the alien's record of conviction—including documents such as the indictment, the judgment of conviction, jury instructions, a signed guilty plea and the plea transcript—evidence[d] a crime that in fact involved moral turpitude." *Id.* at 690. Finally, if the record of conviction

was also inconclusive, *Silva-Trevino I* instructed the IJ to "consider evidence beyond the formal record of conviction." *Id.*

Critically, step three of the *Silva-Trevino I* framework, and probably part of step two (insofar as it required the IJ to make a determination about the particular facts of the conviction) put a burden of producing historical facts on the noncitizen. See *id.* at 703 n.4. *Silva-Trevino I* was still the Board's last authoritative word at the time when this court decided cases such as *Sanchez v. Holder*, 757 F.3d 712 (7th Cir. 2014), and *Cano-Oyarzabal v. Holder*, 774 F.3d 914 (7th Cir. 2014). In both of those decisions, we recognized that the Board was using an individualized inquiry. See *Sanchez*, 757 F.3d at 718; *Cano-Oyarzabal*, 774 F.3d at 917 (applying *Silva-Trevino I* and looking at "evidence beyond the formal record of conviction" to "discern the nature of the underlying conviction"). Step three of the *Silva-Trevino I* framework invites the submission of facts related to the conviction. As with all facts, it was the noncitizen's burden to find and present that evidence.

But *Silva-Trevino I* is no longer the law. The Board revisited this very case in *Silva-Trevino III*, *supra*, after the Attorney General directed it to develop "a uniform standard for determining whether a particular criminal offense is a crime involving moral turpitude." 26 I. & N. at 826, citing *Matter of Silva-Trevino*, 26 I. & N. Dec. 550 (A.G. 2015) (remand order) (*Silva-Trevino II*). In carrying out the Attorney General's instruction, the Board was guided by the Supreme Court's decisions in *Moncrieffe v. Holder*, 569 U.S. 184 (2013); *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007); *Shepard v. United States*, 544 U.S. 13 (2005); and *Taylor v. United States*, 495 U.S. 575 (1990). Those decisions collectively spell out the Court's categorical and modified categorical methodology for

characterizing a statute of conviction, and they demonstrate that the Court has required this approach for immigration cases.

Following the model established in *Moncrieffe*, the Board announced in *Silva-Trevino III* that it would apply the "realistic probability" test to the crime of conviction to see if it fits within the generic definition of a crime involving moral turpitude. *Silva-Trevino III*, 26 I. & N. Dec. at 831. That test, it explained, "requires us to focus on the minimum conduct that has a realistic probability of being prosecuted under the statute of conviction, rather than on the facts underlying the respondent's particular violation of that statute." *Id.* The Board continued with these remarks:

> In cases where the statute of conviction includes some crimes that involve moral turpitude and some that do not, adjudicators must determine if the statute is divisible and thus susceptible to a modified categorical approach. Under such an analysis, resort to the record of conviction is permitted to identify the statutory provision that the respondent was convicted of violating. See *Descamps*, 133 S. Ct. at 2281, 2283 …. A criminal statute is divisible so as to warrant a modified categorical approach only if (1) it lists multiple discrete offenses as enumerated alternatives or defines a single offense by reference to disjunctive sets of "elements," more than one combination of which could support a conviction and (2) at least one, but not all, of those listed offenses or combinations of disjunctive

> elements is a categorical match to the relevant generic standard.

*Id.* at 833. Notably, *Silva-Trevino III* dropped the third part of the *Silva-Trevino I* test, which was the part that gave the noncitizen the opportunity to introduce additional facts about the conduct giving rise to the crime of conviction. It left intact the noncitizen's burden to direct the Board's attention to a case (either his own or other cases) showing that the statute of conviction applies to conduct outside the scope of the generic offense.

It is true that a "crime of moral turpitude" is an odd match for the categorical approach. The moral turpitude label refers to a particular quality of conduct, as opposed to an act that can be broken into specific elements. But the Board has addressed this problem by defining various generic crimes that do have specific elements as either categorically evincing moral turpitude or not. For example, the Board here compared its generic definition of an aggravated assault to New Jersey's crime of assault with a deadly weapon. Both *Chevron* deference and the soundness of the Board's reasoning in *Silva-Trevino III* thus lead us to adopt that framework for characterizing crimes of moral turpitude in immigration cases.

Garcia-Martinez has pointed to his own case to show that the New Jersey statute under which he was convicted covers conduct beyond generic assault with a deadly weapon. We examine that showing, as well as the central legal question whether his crime of conviction was one of moral turpitude. See *Guzman-Rivadeneira v. Lynch*, 822 F.3d 978, 979 (7th Cir. 2016) (describing whether the petitioner's crime was one of moral turpitude as the "underlying question of law" in the case). Courts and agencies decide questions of law

independent of any burdens of proof imposed on the litigants. *Parks v. Ross*, 52 U.S. 362, 373 (1850) ("It is undoubtedly the peculiar province … of the court to determine all questions of law arising thereon."). As applied here, the question whether the New Jersey law categorically describes a crime of moral turpitude is for the court to decide. See, *e.g.*, *Mata-Guerrero v. Holder*, 627 F.3d 256, 259 (7th Cir. 2010) ("[T]he classification of a crime as one of moral turpitude is a question of law …."); see also *Mellouli v. Lynch*, 135 S. Ct. 1980, 1987 (2015) (explaining that the categorical approach "focus[es] on the legal question of what a conviction *necessarily* established").

### B

Garcia-Martinez was convicted under New Jersey's general assault statute, N.J.S.A. § 2C:12-1. That statute covers assaults of all kinds, from simple assault, § 2C:12-1(a), to aggravated assault, § 2C:12-1(b), to assault with an auto or vessel, § 2C:12-1(c), to others. There is no dispute that Garcia-Martinez's offense was "aggravated assault," as New Jersey defines it in § 2C:12-1(b), which reads as follows in pertinent part:

> A person is guilty of aggravated assault if he: …
>
> (2) Attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon; … .

N.J.S.A. § 2C:12-1b(2). Elsewhere, the New Jersey statute provides definitions of the terms used in chapter 12 (among others). There we find the relevant definition of "deadly weapon":

> "Deadly weapon" means any firearm or other weapon, device, instrument, material or

> substance, whether animate or inanimate,
> which in the manner it is used or is intended to
> be used, is known to be capable of producing
> death or serious bodily injury or which in the
> manner it is fashioned would lead the victim
> reasonably to believe it to be capable of produc-
> ing death or serious bodily injury … .

N.J.S.A. § 2C:11-1(c).

Taken together, New Jersey's law forbidding aggravated assault and its definition of "deadly weapon" fit comfortably within the scope of the Board's definition of a morally turpitudinous generic aggravated assault. Furthermore, the Board's holding that, "since the respondent's offense requires a knowing or purposeful *mens rea*, the use of a deadly weapon, and that the victim suffered bodily harm, it is categorically a crime of moral turpitude," is a reasonable application of the latter term. Garcia-Martinez does not contest this point.

But that is not the end of the inquiry. A law that appears to fit the generic offense on its face might cover conduct that does not exhibit moral turpitude. See, *e.g.*, *Silva-Trevino III*, 26 I. & N. Dec. at 833–36 & n.10 (holding that Texas's indecency-with-a-child statute did not categorically involve moral turpitude under the realistic probability test, because Texas courts did not interpret it to require "knowledge that the victim was a minor"). If the New Jersey statute as applied covers more conduct, or different conduct, than the generic crime, then it is not a categorical match. In making that determination, the Board is entitled to look at the language of the statute, at New Jersey decisions applying the statute, and at the official record of the petitioner's own predicate conviction (*i.e.* the

indictment, the record of any guilty plea, and the other *Shepard* materials). Those materials will shed light on the breadth of the New Jersey offense. But, as *Leocal* indicated, the Board may not explore whether the underlying facts of the specific case before it meet the generic definition. 543 U.S. at 7 ("This language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime.").

We review *de novo* the BIA's legal conclusion that Garcia-Martinez's statute of conviction as applied remains a match for the generic crime. *Kiorkis v. Holder*, 634 F.3d 924, 928 (7th Cir. 2011). The Supreme Court has instructed that, in conducting that inquiry, a court must find:

> a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime. To show that realistic probability, an offender, of course, may show that the statute was so applied in his own case. But he must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues.

*Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007). For this purpose, Garcia-Martinez is relying on the facts of his own conviction.

## C

As we noted at the outset, both the Board and this court have described a crime involving moral turpitude as "conduct that shocks the public conscience as being inherently base,

vile, or depraved, and contrary to the accepted rules of moral-ity and the duties owed between persons or to society in gen-eral." *Sanchez v. Holder*, 757 F.3d 712, 715 (7th Cir. 2014) (quot-ing *Lagunas-Salgado v. Holder,* 584 F.3d 707, 710 (7th Cir. 2009)) (internal quotation marks omitted); *Silva-Trevino III*, 26 I. & N. Dec. at 833. With that definition in mind, the Board should have asked whether the *minimum* (hypothetical) conduct for which there is a realistic probability of prosecution under the statute being considered reflects the necessary degree of de-pravity. *Silva-Trevino III*, 26 I. & N. Dec. at 831. If the crime of conviction can apply to both conduct involving moral turpi-tude and conduct that does not meet that standard, then it is not categorically a crime involving moral turpitude. *Id.* at 830–31. A conviction under such a statute thus would not make a petitioner inadmissible under 8 U.S.C. § 1182(a)(2)(A)(i)(I). (Some statutes are divisible and thus sub-ject to a modified categorical analysis, see *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016), but both parties agree that the aggravated-assault subsection of N.J.S.A. § 2C:12-1b can-not be divided up any further.)

In Garcia-Martinez's case, the Board strayed from this "minimum conduct" and "reasonable probability" inquiry. Instead of accepting the facts as set forth in the state-court rec-ord of conviction, the Board speculated that one of Garcia-Martinez's accomplices may have possessed a traditional deadly weapon. It also observed that Garcia-Martinez had not identified for it "*another* [New Jersey] case that was prose-cuted even though the weapon was not sufficiently 'deadly' to involve turpitude" (emphasis added). The latter statement is troublesome for two reasons. First, if the permissible evi-dence shows that Garcia-Martinez's own conviction was for conduct outside the scope of generic assault with a deadly

weapon, that is enough to show that the *minimum* conduct that has a realistic probability of being prosecuted does not reflect moral turpitude—Garcia-Martinez was, after all, prosecuted for it, and so there was nothing hypothetical about the risk. Second, it implies that the Board has in mind a range of deadliness for weapons, and that only after some threshold is crossed will the crime of assault with that weapon become one of moral turpitude. Yet the Board did not explain where that line is drawn, nor did it acknowledge that the use of a foot to trip someone might represent the minimum conduct needed for a conviction under New Jersey's law. Perhaps the Board has not seen the need for greater precision in its earlier cases, because in those instances the weapons have fit well within the common-sense core of the "deadly weapon" label. But even a brief review of state and federal cases shows that the line that defines what counts as a deadly weapon can be drawn in many places. Given the Board's longstanding position that simple assault is not a crime of moral turpitude, see, *e.g.*, *Matter of Short*, 20 I. & N. Dec. 136, 139 (BIA 1989), a "deadly weapon" conviction in some states may fall on the "non-turpitudinous" side of the line.

For all the record of conviction here shows, the only weapons anyone had in the fracas leading to Garcia-Martinez's earlier conviction were body parts: hands, fingers, feet. Body parts are sometimes, but not always, considered to be deadly weapons. Cases so holding include *State v. Allen,* 193 N.C. App. 375 (2008) (hands); *State v. Bennett*, 328 S.C. 251 (1997) (hands and fists); *People v. Ross*, 831 P.2d 1310 (Colo. 1992) (fists); and *Pulliam v. State*, 298 So.2d 711 (Miss. 1974) (hands and feet). In other instances, courts have declined to characterize body parts as deadly or dangerous weapons. See *People v. Aguilar*, 16 Cal.4th 1023, 1034 (1997) (hands and feet cannot

be deadly weapons); *United States v. Rocha*, 598 F.3d 1144, 1157 (9th Cir. 2010) (hands and feet not deadly or dangerous weapons). Some of the latter courts do allow a finding that a tennis shoe on an assailant's foot, which is then used to kick a victim, is a deadly weapon. *United States v. Swallow*, 891 F.3d 1203, 1205 (9th Cir. 2018) (tennis shoes qualify as dangerous weapon because they were "undoubtedly used … to augment the force" of kicks); *United States v. Steele*, 550 F.3d 693, 699 (8th Cir. 2008) (kicking victim in torso with tennis shoes). Still other cases have considered teeth to be deadly weapons when used to bite a victim, though these cases often had the threat of HIV transmission lurking in the background. See, *e.g.*, *United States v. Sturgis*, 48 F.3d 784 (4th Cir. 1995). New Jersey, the state of Garcia-Martinez's conviction, has its own quirks. There, placing a hand in a pocket so as to make a victim believe it is a gun counts as the use of a deadly weapon. See *State v. Hutson*, 107 N.J. 222, 226–28 (1987).

The Board left most of this unexplored. It did not explain why Garcia-Martinez's act of sticking his leg out to trip the victim was an act of moral turpitude, thus making his offense fall within the generic crime of assault with a deadly weapon—if that is indeed what it decided (also unclear). To the extent the Board was relying on accomplice liability, it did not explain whether its decision rested only on the assumption that the actual assailants were using their fists, or also on the unsupported speculation that they were holding some other unspecified weapon that the New Jersey judge thought unimportant enough not to address. This is pertinent, we stress, only for the light it sheds on the scope of the New Jersey statute. New Jersey is free to convict people under any of these theories or factual assumptions, but if its statute sweeps in the use of a leg to trip someone (something that has

probably happened in every elementary school in the country at one time or another), then the question is whether that conduct matches the generic definition of use of a deadly weapon in a way that involves moral turpitude, or if instead it is too broad for the New Jersey conviction to be used for immigration purposes.

The Board did not explain why the generic definition of assault with a deadly weapon includes tripping. If that omission was because it was not relying on the use of the foot to trip and instead was looking at Garcia-Martinez's accomplices, we have a different problem: there is no record evidence (*i.e.* evidence satisfying the *Shepard* criteria, as required by *Silva-Trevino III*) that they used anything but their own fists and feet. The Board's musings that the actual assailants may have had other weapons are no substitute for evidence. And absent some evidence of a traditional deadly weapon before the state court, Garcia-Martinez's conviction could not have "'necessarily' rested" on the existence of such a weapon. *Shepard*, 544 U.S. at 21. Moreover, the Board did not explain why the accomplices' known behavior falls within the generic definition of the offense of conviction. Its failure to explore these points cannot be dismissed as harmless error. The process works only if the Board, using the categorical approach, slogs through each statute and decides whether it categorically stays within the boundaries of a crime of moral turpitude for purposes of section 1182(a)(2)(A)(i)(I), or if it encompasses additional behavior that does not so qualify.

Garcia-Martinez was sentenced to time served for his plea to assault with a deadly weapon. Had he known that the Board would consider this statute of conviction categorically to involve moral turpitude—even though he insists that his

only act was to trip his victim—he may have gone to trial, or he may have pleaded guilty to a different statutory violation calling for additional incarceration but less serious immigration consequences. See *Mellouli*, 135 S. Ct. at 1987 (describing "safe harbor" guilty pleas that shield defendants from immigration consequences). Defendants, their attorneys, and prosecutors must constantly negotiate this balancing act among trial, criminal punishment, and immigration consequences. See *Lafler v. Cooper*, 566 U.S. 156, 169 (2012) ("[C]riminal justice today is for the most part a system of pleas, not a system of trials. Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas."). It is incumbent on courts and agencies to establish rules and standards that allow each of these actors to appreciate the full consequences of their choices. See *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (explaining that providing "fair notice" of the criminal consequences of an individual's actions is at the core of the due process guarantee); *Padilla v. Kentucky*, 559 U.S. 356 (2010) (requiring effective counsel to advise defendants of the immigration consequences of a guilty plea).

Garcia-Martinez cannot go back in time and renegotiate his plea in response to whatever definition of "deadly weapon" the Board now adopts. But both he and this court are entitled to know why the Board characterized his New Jersey offense as it did. Because we cannot tell on this record, we must return this case to the Board for further proceedings.

## D

To the extent that it may be relevant, we note as well that the Board seems to have misconstrued what Garcia-Martinez is saying about the factual basis for his conviction. Garcia-

Martinez argued that his plea colloquy contained the entire factual basis for his conviction. The Board understood him to be saying that the plea colloquy was inconclusive on the question whether his accomplices possessed some unidentified traditional deadly weapon. It then stated that any factual ambiguity about whether the record established the type of weapon(s) Garcia-Martinez's accomplices were or were not using was to be construed against him because "he bears the burden of establishing his eligibility for relief," citing 8 U.S.C. § 1229a(c)(4)(A)(i) and 8 C.F.R. § 1240.8(d). It is true that for the case as a whole, Garcia-Martinez had the burden of producing whatever *facts* were pertinent to his application for cancellation of removal. *Cf. Lopez-Esparza v. Holder*, 770 F.3d 606, 607 (7th Cir. 2014) (noting that under the same regulations as are applicable here, petitioner bears burden of proving the factual contention that he had been continuously present in the United States for ten years). But now that *Silva-Trevino III* has replaced *Silva-Trevino I*, the question whether the crime of conviction is one of moral turpitude does not turn on the particular facts underlying the conviction. Garcia-Martinez was entitled to show the Board the record on which the New Jersey courts actually relied; that record shows that he was convicted without any further fact-finding about the nature of the accomplices' weapons. The only task left for the Board was to decide as a matter of law how the New Jersey statute maps onto the generic offense of assault with a deadly weapon.

The Board failed to explain why Garcia-Martinez failed to meet his burden of showing applications of New Jersey law that went beyond the generic offense. It seemingly rested this conclusion on its belief that all parties agreed that Garcia-Martinez's plea colloquy was ambiguous. That is not accurate.

In fact, the argument that the factual basis for Garcia-Martinez's plea was incomplete or inconclusive came as a surprise to everyone: rather than coming from the DHS attorney, it originated with the IJ at the hearing. Garcia-Martinez has contended throughout these proceedings that his state plea colloquy, which is in the record, laid out all of the facts relevant to his conviction. The DHS attorney at his initial hearing did not suggest otherwise. And Garcia-Martinez's argument comports with the Supreme Court's instructions to present a transcript of a plea colloquy to establish the facts of a pleaded conviction for the categorical inquiry. See *Shepard*, 544 U.S. at 20–21 ("[I]n pleaded cases the [relevant documents] would be the statement of factual basis for the charge … shown by a transcript of plea colloquy …. With such material in a pleaded case, a later court could generally tell whether the plea had 'necessarily' rested on the fact identifying the [crime] as generic."). Additionally, the New Jersey Supreme Court requires courts to establish a factual basis before accepting a guilty plea, and the state court accepting Garcia-Martinez's conviction said nothing about the need to establish the existence of a traditional deadly weapon. See *State v. Lipa*, 219 N.J. 323, 331 (2014) (citing *State v. Crawley*, 149 N.J. 310, 318 (1997)) ("Before a court can accept a defendant's guilty plea, it first must be convinced that [ ] the defendant has provided an adequate factual basis for the plea ….").

Last, the Board did not explain why, given the abrupt way in which the IJ found factual ambiguity, it nevertheless upheld the IJ's decision to rule against Garcia-Martinez without offering him the opportunity to respond. It appears to us that Garcia-Martinez has entered all the relevant *Shepard* documents into the record, and so the Board should be able to decide as a matter of law whether New Jersey's assault with a

deadly weapon statute is closer to generic simple assault, and thus not a crime of moral turpitude, or stays within the boundaries of generic assault with a deadly weapon, and thus reflects moral turpitude. On remand if the BIA is concerned about the completeness of Garcia-Martinez's *Shepard* documents, it should explain that view and Garcia-Martinez should be given the opportunity to present any necessary additional materials.

## III

We GRANT the petition for review and REMAND the case to the Board of Immigration Appeals for further proceedings consistent with this opinion.