In the

# United States Court of Appeals
## for the Seventh Circuit

---

Nos. 19-3437 & 20-1591

DULCE M. ZARAGOZA,

*Petitioner*,

*v.*

MERRICK B. GARLAND,
Attorney General of the United States,

*Respondent*.

---

Petitions for Review of Orders of the
Board of Immigration Appeals.
No. A061-636-606

---

ARGUED DECEMBER 3, 2020 — DECIDED NOVEMBER 8, 2022

---

Before SYKES, *Chief Judge*, and FLAUM and ST. EVE, *Circuit Judges*.

SYKES, *Chief Judge*. Dulce Zaragoza, a native and citizen of Mexico and a lawful permanent resident of the United States, pleaded guilty to the Indiana offense of criminal neglect of a dependent after locking her six-year-old son in a

closet for six hours. She was sentenced to one year in jail suspended to time served plus 30 days, with the remainder of the sentence to be served on probation. After completing her sentence, she traveled abroad and presented herself for admission when she returned. The Department of Homeland Security ("DHS") found her inadmissible based on the neglect conviction, which the agency classified as a "crime involving moral turpitude." 8 U.S.C. § 1182(a)(2)(A)(i)(I). She was placed in removal proceedings.

Zaragoza fought removal on several grounds, with her arguments expanding as the proceedings progressed. Before the immigration judge, she argued that the Indiana neglect offense does not qualify as a crime involving moral turpitude. The judge disagreed and entered a removal order, and Zaragoza appealed to the Board of Immigration Appeals ("BIA" or "the Board"). In the meantime, she petitioned the state court to modify her sentence. Her purpose was to bring herself within the so-called "petty offense" exception to inadmissibility, which is available to first-time offenders sentenced to six months or less. *Id.* § 1182(a)(2)(A)(ii)(II). The state court obliged and reduced her one-year sentence to 179 days. With that order in hand, Zaragoza argued before the BIA that Indiana's neglect offense is not a crime involving moral turpitude, and regardless, the petty-offense exception applies.

The BIA rejected both arguments, agreeing with the immigration judge that the Indiana offense is categorically a crime involving moral turpitude, and further holding that the sentence-modification order was not effective to establish Zaragoza's eligibility for the petty-offense exception. For the latter conclusion, the Board relied on a recent decision of

the Attorney General declaring that state-court sentence-modification orders are effective for immigration purposes *only* if based on a legal defect in the underlying criminal proceeding. *Matter of Thomas & Thompson* ("*Thomas*"), 27 I. & N. Dec. 674, 690 (Att'y Gen. 2019).

Zaragoza sought reconsideration, this time adding two more arguments: (1) the phrase "crime involving moral turpitude" is unconstitutionally vague; and (2) the Attorney General's decision in *Thomas* is impermissibly retroactive as applied to her. The BIA disagreed on both counts. Zaragoza petitioned for review in this court, reprising the entire array of arguments she presented to the Board.

We agree with the BIA's resolution of all issues but one: applying *Thomas* in Zaragoza's case is an impermissibly retroactive application of a new rule. We therefore remand to the BIA for further proceedings consistent with this opinion.

## I. Background

After emigrating from her native Mexico, Zaragoza settled in Indiana with her three children and in August 2011 became a lawful permanent resident. On October 9, 2013, she punished her six-year-old son by barricading him in a closet while she was at work. She left him with nothing except a cup of water, a hot-dog bun with ketchup on it, and a bowl to urinate in if needed. After instructing her older son not to release the younger boy from the closet, she left the house. The boy remained in confinement for six hours.

Zaragoza was charged in state court with neglect of a dependent in violation of Indiana Code § 35-46-1-4(a)(2), which makes it unlawful for "[a] person having the care of a de-

pendent … [to] knowingly or intentionally … abandon[] or cruelly confine[] the dependent." Though the offense was a Class D felony, *id.* § 35-46-1-4(a) (2013),[1] punishable by a term of imprisonment of up to three years, *id.* § 35-50-2-7(a), Zaragoza entered into a plea agreement pursuant to a statute that permitted the court to enter judgment for a Class A misdemeanor, *id.* § 35-5-2-7(c), punishable by a maximum term of imprisonment of one year, *id.* § 35-50-3-2. On March 31, 2014, a state-court judge approved the plea agreement, accepted Zaragoza's guilty plea, and sentenced her to one year in jail suspended to time served plus 30 days, with the remainder of the one-year term to be served on probation, and a $50 fine. She completed her sentence and was discharged from supervision in March 2015.

A few months later, Zaragoza traveled abroad. On July 7, 2015, she returned through Chicago and presented herself for inspection as a returning lawful permanent resident. Customs officials discovered her neglect conviction and paroled her into the United States in anticipation of removal proceedings. On August 6 DHS initiated removal proceedings based on her neglect conviction, which the agency classified as a "crime involving moral turpitude," making her inadmissible under § 1182(a)(2)(A)(i)(I).

Zaragoza moved to terminate the proceedings, arguing that neglect of a dependent is not a crime involving moral turpitude. An immigration judge disagreed, concluding that Indiana's neglect offense is a crime involving moral turpitude under the categorical approach as explained in the

_____

[1] Indiana now punishes the base neglect offense as a Level 6 felony. IND. CODE § 35-46-1-4(a) (2021).

BIA's decision in *Matter of Silva-Trevino*, 26 I. & N. Dec. 826, 830 (B.I.A. 2016). The judge denied Zaragoza's motion and ordered her removed.

Zaragoza sought review in the BIA. While her appeal was pending, she petitioned the state court to modify her sentence to 179 days in prison. That was an odd request on the surface, not least because Zaragoza had long since completed her sentence. But her purpose was apparent in light of the removal peril she faced. As a first-time offender, if her sentence was not "in excess of 6 months," she would qualify for the petty-offense exception to inadmissibility under § 1182(a)(2)(A)(ii)(II). The prosecutor approved Zaragoza's request, and on February 13, 2019, the state court entered an order modifying her sentence to 179 days suspended, with all terms and financial obligations satisfied.

Back before the BIA, Zaragoza reiterated her position that the Indiana neglect offense is not a crime involving moral turpitude, but she now also claimed that the petty-offense exception lifted the inadmissibility bar. The BIA rejected both arguments. In a decision issued on November 14, 2019, the Board first agreed with the immigration judge's ruling that the neglect offense is categorically a crime of moral turpitude. Turning to the petty-offense exception, the Board explained that under the Attorney General's recent decision in *Thomas*, issued just a few weeks earlier, the state court's sentence-modification order had no effect for immigration purposes because it was not based on a procedural or substantive defect in the underlying criminal proceeding. Zaragoza's eligibility thus turned on her original sentence, not her sentence as modified. Because she was originally sentenced to one year in prison, she did not

qualify for the exception. The Board dismissed her appeal, and Zaragoza petitioned for review of that order.

In the meantime, she asked the BIA to reconsider its decision. Her motion added two new arguments. She now claimed that the statutory phrase "crime involving moral turpitude" is unconstitutionally vague. She also argued that applying the Attorney General's decision in *Thomas* to her amounted to an impermissibly retroactive application of a new rule.

The Board denied the reconsideration motion, standing by its decision that the Indiana neglect offense is a crime involving moral turpitude and rejecting the new vagueness challenge to the statute. The Board also rejected Zaragoza's claim that applying *Thomas* in her case is an impermissibly retroactive application of a new rule. Zaragoza petitioned for review of the BIA's second order, and we consolidated the two petitions. *See* 8 U.S.C. § 1252(b)(6).

## II. Discussion

Zaragoza reprises the full assortment of legal challenges that she raised before the agency. Some of the issues are complex, and two have attracted support from amici curiae. For ease of presentation, we separate them into two groups.

In the first group are arguments pertaining to the meaning and application of § 1182(a)(2)(A)(i)(I)—specifically, whether the phrase "crime involving moral turpitude" is unconstitutionally vague and whether Indiana's neglect offense qualifies as such a crime under the categorical approach and the BIA's decision in *Silva-Trevino*. In the second group are claims pertaining to the petty-offense exception, including Zaragoza's arguments that the Attorney General's

decision in *Thomas* is wrong as a matter of law and not entitled to deference and is impermissibly retroactive as applied to her.

Because these are legal issues, our standard of review is de novo, *Meraz-Saucedo v. Rosen*, 986 F.3d 676, 684 (7th Cir. 2021), with one important qualifier. We defer to the agency's reasonable interpretation of the immigration laws in its precedential decisions and also its "[n]on-precedential decisions that rely on applicable Board precedent." *Cano-Oyarzabal v. Holder*, 774 F.3d 914, 916 (7th Cir. 2014).

## A. Crime Involving Moral Turpitude

### 1. *Unconstitutional Vagueness*

Zaragoza begins with the argument that the statutory phrase "crime involving moral turpitude" is unconstitutionally vague.[2] She primarily relies on a trio of recent Supreme Court decisions addressing vagueness challenges to the definitions of "crime of violence" and "violent felony" in statutes that use these terms to denote certain convictions that carry sentencing and immigration consequences. *See United States v. Davis*, 139 S. Ct. 2319 (2019) (residual clause defining "crime of violence," 18 U.S.C. § 924)); *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) (residual clause defining "crime of violence," 18 U.S.C. § 16); *Johnson v. United States*, 576 U.S. 591 (2015) (residual clause defining "violent felony," 18 U.S.C. § 924(e)).

---

[2] Zaragoza purports to challenge the statute both facially and as applied, but she does not delineate any ground on which the phrase "crime involving moral turpitude" is vague only as applied to her. Rather, her argument rests entirely on her view that the phrase is inherently vague. We therefore construe this as a facial challenge.

Zaragoza's challenge immediately runs headlong into *Jordan v. De George*, 341 U.S. 223, 232 (1951), a much earlier decision specifically holding that the phrase "crime involving moral turpitude" as used in immigration law—there, the Immigration Act of 1917—is not unconstitutionally vague. *Jordan* squarely controls here.

Zaragoza responds that *Jordan* is no longer authoritative because it did not consider the categorical way in which the BIA and the courts now classify convictions for immigration and sentencing purposes. But she challenges the language of the statute, not the decision method courts use to classify convictions for these purposes. And *Jordon* squarely holds that the statutory phrase "crime involving moral turpitude" as used in immigration law is not unconstitutionally vague.

Zaragoza also argues that *Jordan* may be disregarded because it is out of sync with the Court's intervening decisions in *Johnson*, *Dimaya*, and *Davis*. That argument cannot succeed in the court of appeals. *Jordan* is binding on us until the Supreme Court says otherwise. *State Oil Co. v. Kahn*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."). The Court has repeatedly reaffirmed this point: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237–38 (1997) (quotation marks and alteration omitted).

Accordingly, we and other courts have already rejected post-*Johnson* vagueness challenges to the phrase "crime involving moral turpitude." *Dominguez-Pulido v. Lynch*,

821 F.3d 837, 842–43 (7th Cir. 2016); *see also Islas-Veloz v. Whitaker*, 914 F.3d 1249, 1250 (9th Cir. 2019) ("The Court's more recent decisions in *Johnson* and *Dimaya* did not reopen inquiry into the constitutionality of the phrase."); *Moreno v. Att'y Gen.*, 887 F.3d 160, 166 (3d Cir. 2018); *Boggala v. Sessions*, 866 F.3d 563, 570 (4th Cir. 2017). We do so again here.

**2.** *Neglect of a Dependent Is a Crime Involving Moral Turpitude*

Zaragoza next challenges the Board's conclusion that the Indiana neglect offense qualifies as a crime involving moral turpitude. Like other statutory contexts in which the agency must classify convictions for immigration purposes, the categorical approach applies to this inquiry. *See Silva-Trevino*, 26 I. & N. at 830; *see also Garcia-Martinez v. Barr*, 921 F.3d 674, 679 (7th Cir. 2019) ("Both *Chevron* deference and the soundness of the Board's reasoning in *Silva-Trevino* … thus lead us to adopt that framework for characterizing crimes of moral turpitude in immigration cases.").

Applying that framework, we examine whether the statutory definition of the offense fits within the "generic" definition of a crime involving moral turpitude. *Silva-Trevino*, 26 I. & N. at 831. The comparison focuses on "the minimum conduct that has a realistic probability of being prosecuted under the statute of conviction, rather than on the facts underlying the [noncitizen's] particular violation of that statute." *Id.* (citing *Moncrieffe v. Holder*, 569 U.S. 184, 190–91 (2013)); *see also Garcia-Martinez*, 921 F.3d at 679. If Zaragoza can show that the state courts have applied the neglect statute to conduct that does not come within the generic definition, then the offense is not categorically a crime involving moral turpitude. *See Moncrieffe*, 569 U.S. at 206

(explaining that the noncitizen has the burden of demon-
strating that the state law applies to more conduct than the
generic offense covers); *see also Garcia-Martinez*, 921 F.3d at
679.

We begin with the generic definition of a "crime involv-
ing moral turpitude," acknowledging (as we must) that the
"moral turpitude label" is "an odd match for the categorical
approach." *Garcia-Martinez*, 921 F.3d at 679. Though the
phrase is not defined in statute, we give *Chevron* deference to
decisions of the BIA reasonably interpreting that term. *Cano-
Oyarzabal*, 774 F.3d at 916. In *Silva-Trevino* the Board held
that a crime involving moral turpitude has "two essential
elements: reprehensible conduct and a culpable mental
state." 26 I. & N. Dec. at 834. For conduct to be "reprehensi-
ble," it must be "inherently base, vile, or depraved, and
contrary to the accepted rules of morality and the duties
owed between persons or to society in general." *Id.* at 833
(quotation marks omitted). A culpable mental state means
"some degree of scienter, either specific intent, deliberate-
ness, willfulness, or recklessness." *Matter of Ortega-Lopez*,
27 I. & N. Dec. 382, 385 (B.I.A. 2018) (quoting *Matter of
Louissaint*, 24 I. & N. Dec. 754, 757 (B.I.A. 2009)).

We compare that definition with the Indiana neglect of-
fense as defined by statute and as applied by the Indiana
courts. *Garcia-Martinez*, 921 F.3d at 680. The relevant part of
Indiana's neglect statute provides: "A person having the care
of a dependent … who knowingly or intentionally … aban-
dons or cruelly confines the dependent … commits neglect
of a dependent." § 35-46-1-4(a)(2). Indiana courts have
defined "cruelly confines" as "confinement which is likely to
result in a harm such as disfigurement, mental distress,

extreme pain or hurt, or gross degradation, and yet does not necessarily endanger the dependent's life or health." *Hartbarger v. State*, 555 N.E.2d 485, 487 (Ind. Ct. App. 1990); *Demontigney v. State*, 593 N.E.2d 1270, 1272 (Ind. Ct. App. 1992) (applying the *Hartbarger* standard).

So defined, the Indiana neglect offense categorically matches both elements of the generic definition of a "crime involving moral turpitude." First, and more straightforward-ly, the offense requires a sufficiently culpable mental state. The Indiana statute requires intentional or knowing conduct, and the generic crime involving moral turpitude can be established by "specific intent, deliberateness, willfulness, or recklessness." *Ortega-Lopez*, 27 I. & N. Dec. at 385.

Second, the neglect offense requires "reprehensible con-duct." Abandoning or cruelly confining a dependent, as the Indiana courts interpret this offense, qualifies as "inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *Silva-Trevino*, 26 I. & N. Dec. at 833 (quotation marks omitted).

Zaragoza emphasizes that the neglect offense does not require proof of conduct that endangers the dependent's life or health, *see Hartbarger*, 555 N.E.2d at 487, which she be-lieves makes the Indiana offense broader than the generic definition of a crime involving moral turpitude. We disa-gree. Under the *Hartbarger* standard, the offender's conduct must be "likely to result in a harm such as disfigurement, mental distress, extreme pain or hurt, or gross degradation." *Id*. A person who exposes a dependent child to that degree of risk by abandoning or cruelly confining him has engaged in reprehensible conduct.

Zaragoza further contends that merely causing a child "mental distress" is not an act of moral turpitude. But the reference to "mental distress" here must be read in context. *Hartbarger* mentions mental distress in a list of risks that includes "disfigurement," "extreme pain or hurt," and "gross degradation." *Id.* These are all very serious harms, which implies that the inclusion of "mental distress" is understood to encompass only the risk of severe emotional trauma. *See also State v. Downey*, 476 N.E.2d 121, 123 (Ind. 1985) ("The purpose of [§ 35-46-1-4(a)(1)] … is to authorize the intervention of the police power to prevent harmful consequences and injury to dependents.").

Additionally, as the BIA correctly recognized, Zaragoza has failed to demonstrate that there is a "realistic probability" that the neglect statute will be applied to actions causing only minor mental distress, rather than conduct that is "inherently base, vile, or depraved." *Silva-Trevino*, 26 I. & N. Dec. at 831, 833 (quotation marks omitted). She points to her own conviction, which she claims did not involve conduct that is inherently base, vile, or depraved. We disagree. Zaragoza barricaded her six-year-old son in a closet using large items of furniture and leaving him nothing but water, a hot-dog bun with ketchup, and a bowl to urinate in, and she then left her house for six hours. This is undoubtedly "contrary to the accepted rules of morality and the duties owed between persons." *Id.* at 833 (quotation marks omitted).[3]

---

[3] To be clear, we examine the facts of the underlying conviction for the limited purpose of rejecting Zaragoza's argument that the Indiana neglect offense is categorically overbroad.

Zaragoza also points to the specific conduct at issue in *Hartbarger* and in *Scruggs v. State*, 883 N.E.2d 189, 190 (Ind. Ct. App. 2008). The facts of those cases, she argues, establish that the Indiana neglect statute sweeps more broadly that the generic definition of a crime involving moral turpitude. Notably, however, in both cases the defendants' convictions were reversed based on insufficient evidence. *Hartbarger*, 555 N.E.2d at 487; *Scruggs*, 883 N.E.2d at 191. No matter, Zaragoza says, because the categorical approach examines "the minimum conduct that has a realistic probability of being *prosecuted* under the statute of conviction." *Silva-Trevino*, 26 I. & N. Dec. at 831 (emphasis added). Because the defendants in *Hartbarger* and *Scruggs* were *prosecuted* for neglect of a dependent, she insists that the specific conduct at issue in both cases is relevant to the "realistic probability" inquiry even though it was insufficient to support their convictions.

The better reading of *Silva-Trevino* is that the realistic-probability principle considers the minimum conduct that realistically could be *successfully prosecuted* under the statute in question. *Silva-Trevino* relied on the Supreme Court's decision in *Moncrieffe*, which explained that the categorical approach examines "the minimum conduct *criminalized* by the state statute" and requires a showing of "a realistic probability … that the State would *apply* its statute" to the specified conduct. 569 U.S. at 191 (emphases added) (quotation marks omitted); *see also Matter of Chairez-Castrejon*, 26 I. & N. Dec. 349, 356 (B.I.A. 2014) (applying the *Moncrieffe* rule only to successful prosecutions). In other words, the Supreme Court's realistic-probability test, which *Silva-Trevino* incorporates, considers how state law is applied by state courts, not prosecutors. *Gonzales v. Duenas-Alvarez*, 549 U.S.

183, 193 (2007) (explaining that to show a realistic probability, an offender "must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues").

This understanding of *Moncrieffe* and *Silva-Trevino* comports with well-established background norms. Prosecutors are not expositors of law—courts are, which is why we defer to state courts in understanding the content of state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Because the state appellate court held that the specific conduct in *Hartbarger* and *Scruggs* did *not* violate the neglect statute, those cases do not help Zaragoza here.

Zaragoza also likens the Indiana neglect statute to other state statutes that have been held not to constitute crimes involving moral turpitude. Her comparators, however, are inapt. For example, she points to a Fifth Circuit case holding that a Texas child-abandonment statute is not a crime involving moral turpitude. *Rodriguez-Castro v. Gonzales*, 427 F.3d 316, 324 (5th Cir. 2005). But the Texas statute penalized mere negligence, which is not a sufficient mental state of culpability to qualify as a crime involving moral turpitude. *Id.* at 322–23. As we've explained, the Indiana neglect statute requires intentional or knowing wrongdoing, which squarely falls within the generic definition of a crime involving moral turpitude.

In another of Zaragoza's examples, the BIA held that simple battery under California law is not a crime involving moral turpitude because it requires no more than an intentional "touching" of another without consent. *In re Sanudo*, 23 I. & N. Dec. 968, 972 (B.I.A. 2006). Indiana's neglect statute, by contrast, requires a likelihood of "disfigurement,

mental distress, extreme pain or hurt, or gross degradation." *Hartbarger*, 555 N.E.2d at 487. The statute thus covers a narrower and more serious swath of conduct than the California battery statute.[4]

In sum, as interpreted and applied by the state courts, the Indiana neglect statute requires proof that the defendant intentionally or knowingly abandoned or cruelly confined a dependent in such a way that will likely result in "disfigurement, mental distress, extreme pain or hurt, or gross degradation." *Id.* We agree with the BIA that this offense is categorically a crime involving moral turpitude. *Accord Hernandez-Perez v. Holder*, 569 F.3d 345, 348 (8th Cir. 2009) (concluding that a similar child-endangerment statute under Iowa law is a crime involving moral turpitude).

## B. Petty-Offense Exception

Although the Indiana neglect conviction qualifies as a crime involving moral turpitude, the inadmissibility bar is lifted for first-time offenders like Zaragoza if the crime in question was punishable by one year or less and the sentence did not exceed six months. More specifically, Zaragoza

---

[4] Zaragoza also criticizes the BIA and the immigration judge for relying on *Matter of Leal*, 26 I. & N. Dec. 20 (B.I.A. 2012), which held that an Arizona endangerment statute qualifies as a crime involving moral turpitude. She correctly points out that the Arizona and Indiana crimes are different in two ways: the Arizona offense requires a higher risk of serious harm, while the Indiana offense requires a more culpable mental state. The immigration judge simply balanced the difference. We share Zaragoza's skepticism of this approach. Nonetheless, as explained above, our independent application of the categorical approach confirms that the Indiana neglect offense is categorically a crime involving moral turpitude.

is not inadmissible based on her neglect conviction if (1) "the maximum penalty possible for the crime … did not exceed imprisonment for one year" and (2) she "was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed)." § 1182(a)(2)(A)(ii)(II).

It's undisputed that Zaragoza satisfies the first requirement. The neglect offense normally carries a maximum penalty of up to three years in prison, but she pleaded guilty pursuant to a statute that permitted the court to enter judgment for a Class A misdemeanor, which carries a maximum penalty of one year of imprisonment. IND. CODE § 35-50-3-2. And indeed, the judgment reflects that she was convicted of the misdemeanor offense.[5]

The dispute here centers on the second requirement. The exception applies only if the offender was sentenced to a term of six months or less. Based on Zaragoza's original sentence, she is clearly ineligible. She was sentenced to one year of imprisonment suspended to time served plus 30 days. The suspension has no effect on the analysis. As defined in the Immigration and Nationality Act ("INA" or "the Act"), "[a]ny reference to a *term of imprisonment or a sentence* … is deemed to include the period of incarceration or confinement ordered by a court of law *regardless* of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part." 8 U.S.C.

---

[5] In its initial decision, the BIA incorrectly stated that because the offense is normally a Class D felony, which carries a three-year maximum, the petty-offense exception is inapplicable. The Board abandoned this reasoning in its decision denying Zaragoza's motion to reconsider.

§ 1101(a)(48)(B) (emphases added). The petty-offense exception itself contains similar "regardless" language: the exception applies only if the offender's sentence "was not … in excess of 6 months (regardless of the extent to which the sentence was ultimately executed)." *Id.* § 1182(a)(2)(A)(ii)(II) (emphasis added).

But what about the sentence-modification order? Recall that in February 2019 while her appeal was pending before the BIA, Zaragoza sought and obtained an order from a state judge reducing her one-year sentence to 179 days. At the time BIA precedent recognized state-court sentence-modification orders as effective for immigration purposes. *See Matter of Cota-Vargas*, 23 I. & N. Dec. 849, 852 (B.I.A. 2005) (holding that an immigration court must give full faith and credit to a state-court decision modifying a sentence). Accordingly, Zaragoza asked the BIA to evaluate her eligibility for the petty-offense exception based on her sentence *as modified*.

The BIA did not rule on her appeal until nine months after she had obtained the sentence-modification order. By then the Attorney General had issued his decision in *Thomas*, overruling *Cota-Vargas* and holding that state-court sentence-modification orders are effective for immigration purposes *only* if based on a procedural or substantive defect in the underlying criminal proceeding. *Thomas*, 27 I. & N. Dec. at 674. Zaragoza's sentence modification was not based on such a defect. Applying *Thomas*, the Board declined to give it effect for purposes of evaluating her eligibility for the petty-offense exception. Because Zaragoza's original sentence exceeded six months, the Board found her ineligible for the exception.

Zaragoza attacks this ruling on several grounds. She first argues that the Attorney General's decision in *Thomas* is not entitled to deference and is wrong as a matter of law. Alternatively, she argues that even if *Thomas* correctly interpreted the relevant statutes, the decision cannot be applied to her because she reasonably relied on the BIA's preexisting rules—namely, *Cota-Vargas*. Applying *Thomas* to her, she argues, would be a manifestly unjust retroactive application of a new rule.

### 1. Thomas *Is Entitled to Deference*

The pre-*Thomas* legal landscape was a patchwork of inconsistent rules regarding the immigration consequences of state-court orders altering a criminal sentence. If a state court *vacated a conviction* for reasons *other than* a defect in the criminal proceeding, then the immigration consequences remained fixed to the original conviction and sentence. *Matter of Pickering*, 23 I. & N. Dec. 621, 624 (B.I.A. 2003). But if a state court *modified a sentence*, then the immigration consequences were fixed to the new order. *Cota-Vargas*, 23 I. & N. Dec. at 852; *In re Song*, 23 I. & N. Dec. 173, 174 (B.I.A. 2001). If a state court *clarified* a sentence, then the immigration judge was to consider several characteristics of the state-court order before deciding whether immigration consequences should attach to the original sentence or the clarification order. *Matter of Estrada*, 26 I. & N. Dec. 749, 755–56 (B.I.A. 2016).

These inconsistencies, coupled with the perception that state courts were using sentence modifications to circumvent federal immigration law, led the Attorney General to step in. In May 2019 he directed the BIA to refer two pending cases to him for a clarifying opinion. *Thomas*, 27 I. & N. Dec. at 674.

We pause here for a bit of background on the two cases the Attorney General directed the BIA to send. Michael Vernon Thomas, a citizen of Trinidad and Tobago, and Joseph Lloyd Thompson, a citizen of Jamaica, were convicted in unrelated state-court proceedings of the Georgia crime of "family violence battery" and were sentenced to 12 months of imprisonment. *Id.* at 678. Years later, long after they had completed their sentences, DHS placed them in removal proceedings as "aggravated felons" because each man "had been convicted of a 'crime of violence' for which the 'term of imprisonment [was] at least one year.'" *Id.* (quoting 8 U.S.C. § 1101(a)(43)(F)).

While their removal proceedings were pending, Thomas and Thompson returned to state court and obtained orders reducing their sentences to slightly under 12 months. *Id.* at 678–79. The modification orders were not based on any defect in the underlying criminal proceedings, but Thomas and Thompson argued in their removal proceedings that because their sentences had been reduced to less than one year, they were no longer removable as aggravated felons. After directing the BIA to refer the cases, the Attorney General invited the parties and any interested amici to submit briefs regarding the effect of state-court sentence-modification orders for immigration purposes. *Id.* at 674.

On October 25, 2019, the Attorney General issued his decision overruling *Cota-Vargas*, *Song*, and *Estrada* and holding that state-court sentence-modification orders "have no effect for immigration purposes if based on reasons unrelated to the merits of the underlying criminal proceeding, such as rehabilitation or the avoidance of immigration consequences." *Id.*

The decision largely flowed from the definitions of "conviction" and "term of imprisonment" in the INA:

> (A) The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication has been withheld, where—
>
> > (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
> >
> > (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.
>
> (B) Any reference to a *term of imprisonment or a sentence* with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law *regardless* of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

8 U.S.C. § 1101(a)(48) (emphases added).

Anchoring his analysis in the text of these definitions, the Attorney General began with an uncontroversial observation: "An alien plainly has been convicted under the INA when a court has entered 'a formal judgment of guilt,' and he has received a sentence when the court orders a 'period of incarceration or confinement,' no matter whether the sentence [has been] executed." *Thomas*, 27 I. & N. Dec. at 680–81. In other words, by virtue of the "regardless" clause in the definition, the terms "conviction" and "term of imprison-

ment" refer to the original conviction and sentence *notwith-standing* any suspension of the sentence. The "regardless" clause, the Attorney General reasoned, also implied that "other post-sentencing events—such as modifications or clarifications—should not be relevant under the immigration laws." *Id.* at 682.

The Attorney General then looked to the statutory history to confirm this implication, noting that § 1101(a)(48) was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 in response to decisions of the BIA holding that certain suspended sentences were excluded from the definition of "conviction" for immigration purposes. *Id.* at 681. The new statutory definitions of "conviction" and "term of imprisonment" in § 1101(a)(48) displaced the BIA's previous rule about suspended sentences. In this way, "Congress made clear that immigration consequences should flow from the original determination of guilt." *Id.* at 682. By removing the BIA's special treatment of suspended sentences, "Congress ensured uniformity in the immigration laws by avoiding the need for immigration judges to examine the post-conviction procedures of each State." *Id.*

Based on this review of the statutory text and history, the Attorney General concluded that "the phrase 'term of imprisonment or a sentence' in paragraph (B) is best read to concern an alien's *original* criminal sentence, without regard to post-sentencing alterations that, like a suspension, merely alleviate the impact of that sentence." *Id.* But he carved out an exception based on the reasoning in *Pickering*: "If the original sentence was altered because of a legal defect, then the sentence was not legally effective, and there is no valid

sentence to which immigration consequences can attach." *Id.* at 682–83.

The Attorney General thus extended the *Pickering* vacatur framework to *all* sentence alterations, including vacaturs, modifications, and clarifications. *Id.* at 683–85. He accordingly held that "state-court orders that modify, clarify, or otherwise alter a criminal alien's sentence … will be given effect for immigration purposes *only* if based on a procedural or substantive defect in the underlying criminal proceeding." *Id.* at 690 (emphasis added).

Decisions of the Attorney General interpreting the federal immigration statutes are entitled to *Chevron* deference. *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999); *see also* 8 U.S.C. § 1103(a)(1) (stating that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling"). Applying the two-step *Chevron* framework, we first ask "whether 'the statute is silent or ambiguous with respect to the specific issue' before [us]; if so, 'the question for the court [is] whether the agency's answer is based on a permissible construction of the statute.'" *Aguirre-Aguirre*, 526 U.S. at 424 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

Neither the petty-offense exception nor the definitions in § 1101(a)(48) unambiguously resolve whether Zaragoza's original or modified sentence is the correct reference point for determining her eligibility for the exception. The answer instead turns on *Chevron* Step 2.[6] Based on our own review,

---

6 An amicus relies heavily on BIA caselaw predating the statutory definition of "term of imprisonment." 8 U.S.C. § 1101(a)(48)(B). Accord-

we hold that the Attorney General's decision in *Thomas* is a permissible interpretation of the operative statutes—indeed, it is the most reasonable interpretation.

We begin with the language of the petty-offense exception. Zaragoza qualifies for relief from inadmissibility if she *"was not sentenced* to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed)." § 1182(a)(2)(A)(ii)(II) (emphasis added). The use of the past tense suggests that the statute refers to the original sentence as a matter of historical fact; the "regardless" qualifier excludes later alterations of it.

Next, as *Thomas* explains, the definition of the phrase "term of imprisonment" in § 1101(a)(48)—and especially the language directing us to ignore any sentence suspension— implies that in general, subsequent alterations are to be disregarded. The inference here may not be strong enough to conclusively resolve the effect of sentence modifications at

---

ing to the amicus, those decisions establish that a "new, reduced sentence stands as the only valid and lawful sentence imposed" for immigration purposes, *Matter of Martin*, 18 I. & N. Dec. 226, 227 (B.I.A. 1982), and that Congress intended to preserve this rule in enacting § 1101(a)(48). We are not persuaded. As the amicus recognizes, the definition of "term of imprisonment" displaced BIA precedent regarding the immigration effect of *suspended* sentences. Any inferences about Congress's view on *modified* sentences are thin at best—certainly not convincing enough to resolve this case at *Chevron* Step 1. Indeed, to the extent that we can deduce anything from the enactment of § 1101(a)(48), it's that Congress wanted "immigration consequences [to] flow from the original determination of guilt," not a modified determination. *Matter of Thomas & Thompson*, 27 I. & N. Dec. 674, 682 (Att'y Gen. 2019); *see also Saleh v. Gonzales*, 495 F.3d 17, 24 (2d Cir. 2007) (recognizing that § 1101(a)(48)(A) "focuses on the original attachment of guilt").

*Chevron* Step 1, but it confirms that the Attorney General's interpretation of the statute is a reasonable one at *Chevron* Step 2.

Were there any doubt about this analysis, circuit precedent confirms our conclusion. After the BIA held in *Pickering* that immigration consequences remain fixed to a conviction even after it is vacated (with an important exception for vacaturs based on a legal defect), we concluded that the agency's decision was entitled to *Chevron* deference. *Ali v. Ashcroft*, 395 F.3d 722, 728–29 (7th Cir. 2005). Because the definition of "conviction" in § 1101(a)(48)(A) is silent on whether immigration consequences remain attached to a vacated conviction, we did not resolve the case at *Chevron* Step 1. *Id.* at 728. Rather, at *Chevron* Step 2, we held that *Pickering*'s interpretation was reasonable and therefore entitled to deference. *Id.* at 729.

The same result follows here. As we've explained, in *Thomas* the Attorney General extended the *Pickering* vacatur rule to *all* sentence alterations—including, as relevant here, sentence modifications. True, resolving the immigration effect of vacaturs and sentence modifications turns on separate statutory definitions—for the former, it's the definition of "conviction" in § 1101(a)(48)(A); for the latter, it's the definition of the phrase "term of imprisonment or a sentence" in § 1101(a)(48)(B). But the definitions are related and should be read harmoniously. And to the extent that it makes sense to treat vacated convictions differently from sentence modifications, it is far more reasonable to give continued effect to the original sentence after it has been modified than to give continued effect to a conviction after it has been vacated. *Cf. Ali*, 395 F.3d at 729 n.4 ("[I]t would not

make much sense for Ali, whose conviction was modified to avoid deportation, to fare better than the applicant in *Pickering*[,] whose conviction was outright quashed for the same purpose."). And yet we deferred to the BIA's rule in *Pickering*.

Zaragoza responds that deferring to *Thomas* is inconsistent with our obligation to give full faith and credit to a state court's modification of a sentence. *See* 28 U.S.C. § 1738 (requiring that "every court within the United States" give full faith and credit to authenticated "Acts, records and judicial proceedings"). The Attorney General addressed and rejected that argument, reasoning that interpreting and applying the defined terms "conviction" and "term of imprisonment" in federal immigration law does not call into question the validity of the state court's order. *Thomas*, 27 I. & N. Dec. at 686 ("The adjudicator is not reevaluating or otherwise questioning the validity of the state-court judgment. The adjudicator accordingly does not violate the Full Faith and Credit Act."). We agree. The same reasoning defeats Zaragoza's related argument that *Thomas* violates basic federalism principles. Because the federal immigration statutes assign independent effect to state convictions, they do not risk overrunning the domain of state law.

In sum, the Attorney General's decision in *Thomas* is entitled to deference as a permissible construction of the terms "conviction" and "term of imprisonment or a sentence" as defined in § 1101(a)(48). Under the *Thomas* rule, the state court's sentence-modification order is not effective for immigration purposes because it was not based on a procedural or substantive defect in Zaragoza's criminal case.

### 2. *Retroactivity*

Zaragoza argued in her reconsideration motion that applying *Thomas* to her is an impermissibly retroactive application of a new rule. The Board rejected that argument. We review retroactivity questions independently, owing no deference to the agency's ruling. *Velásquez-García v. Holder*, 760 F.3d 571, 578–79 (7th Cir. 2014)

The law generally disfavors the retroactive application of new legal rules. *See id.* at 579. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). But deciding when a new rule operates retroactively "is not always a simple or mechanical task." *Id.* at 268. A new rule is not necessarily "retroactive" in effect simply because it is applied in a case arising from conduct predating its adoption. *Id.* at 269. Rather, a determination that a particular rule operates retroactively "comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* at 270. The inquiry, in other words, "demands a commonsense, functional judgment" and is "informed and guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'" *Martin v. Hadix*, 527 U.S. 343, 357–58 (1999) (quoting *Landgraf*, 511 U.S. at 270)).

As a general matter, "[a] rule is considered to be retroactive" in effect "when it 'attaches new legal consequences to events completed before its enactment.'" *Velásquez-García*, 760 F.3d at 579 (quoting *Landgraf*, 511 U.S. at 270). A rule

attaches "new legal consequences" to completed events when it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *I.N.S. v. St. Cyr*, 533 U.S. 289, 321 (2001) (quoting *Landgraf*, 511 U.S. at 269).

A vexing problem in retroactivity cases is to identify the appropriate reference point for analysis—the event or moment in time by which to judge whether an intervening legal development imposes new consequences or disabilities. *See Vartelas v. Holder*, 566 U.S. 257, 269–70 (2012); *id.* at 277 (Scalia, J., dissenting). Zaragoza and the government offer competing possibilities.[7] The government contends that the correct point of reference is March 31, 2014, when Zaragoza was convicted and sentenced for the neglect offense. Because she had no fixed entitlement to the petty-offense exception at that point in time, the government argues that *Thomas* does not have retroactive effect as applied to her. Zaragoza counters with two possible reference points—either March 31,

---

[7] After oral argument we ordered supplemental briefing on the retroactivity question and specifically asked the parties to brief the relevant point of reference for retroactivity analysis in this case and the application of the retroactivity factors discussed in *Velásquez-García v. Holder*, 760 F.3d 571 (7th Cir. 2014). Zaragoza asserted that the government had waived any argument about retroactivity by failing to respond to her discussion of *Velásquez-García* in her opening brief. We disagree. Although the government did not specifically address the *Velásquez-García* factors in its original brief, it responded in a more general way to Zaragoza's retroactivity argument, which is enough to avoid waiver. *Sec'y, U.S. Dep't of Lab. v. Preston*, 873 F.3d 877, 883 n.5 (11th Cir. 2017) ("Parties can most assuredly waive positions and issues on appeal, but not individual arguments—let alone authorities.").

2014, when she was convicted and sentenced, or February 13, 2019, when the state court entered its sentence-modification order. As Zaragoza sees it, *Thomas* is impermissibly retroactive by reference to either event.

We conclude that the proper reference point for the retroactivity inquiry is the February 2019 sentence-modification order. As we've noted, retroactivity analysis is concerned with the degree of connection between the new rule and the relevant past event. More specifically, the analysis asks whether a new rule "impairs vested rights acquired under existing laws." *St. Cyr*, 533 U.S. at 321 (quotation marks omitted). When the state court entered the sentence-modification order, Zaragoza acquired a legal entitlement to the petty-offense exception under existing immigration law—namely, the BIA's decision in *Cota-Vargas*. As of that event, she had a complete defense to removal. The Attorney General's decision in *Thomas* overruled *Cota-Vargas*, eliminating the defense. So the "transaction[] or consideration[]" to which *Thomas* attached legal consequences was the sentence-modification order. *Id.* The rule of *Thomas* therefore has retroactive effect as applied in Zaragoza's removal proceedings.

The government resists this conclusion, relying on the Supreme Court's decisions in *Vartelas* and *St. Cyr*, both of which used the immigrant's underlying conviction to evaluate the retroactive effect of later legal developments. But neither of those cases involved sentence modifications, so the Court had no occasion to consider the problem presented here.

Instead, this case is closer to our decision in *Jeudy v. Holder*, 768 F.3d 595 (7th Cir. 2014). There, an immigrant

committed a removable offense after living in the United States for six years. He continued to live in the United States, and just a year later, he became eligible to request cancellation of removal since he had continuously lived in the country for seven years. Congress later enacted a "stop-time rule," which stops the seven-year continuous-residency clock when an immigrant commits a removable offense. 8 U.S.C. § 1229b(d)(1). Because Jeudy had committed the removable offense before the seven years were up, the BIA concluded that he was ineligible to apply for cancellation of removal. *Jeudy*, 768 F.3d at 596–97.

We disagreed, instead holding that the stop-time rule was impermissibly retroactive as applied in Jeudy's case because he "was actually eligible for discretionary relief before [the new stop-time rule] took effect." *Id.* at 603. In other words, in *Jeudy* there wasn't a retroactivity problem simply because his conviction predated the new law; rather, a postconviction *event* made Jeudy unquestionably eligible for relief from removal, only to then be foreclosed by a later legal development.

The same is true here. A postconviction event— Zaragoza's sentence modification—gave her a right to relief from removal, only to be taken away by *Thomas*. Because the state court's sentence-modification order predated *Thomas*, the decision is retroactive as applied to her.

Our next question is whether retroactive application is impermissible in Zaragoza's case. As we explained in *Velásquez-García*, when an agency interprets a statute "as an incident of its adjudicatory function," it may permissibly apply the new interpretation in the case in which it is announced. 760 F.3d at 581 (quotation marks omitted). But "a

retrospective application can be properly withheld" in other cases "when to apply the new rule to past conduct or prior events would work a manifest injustice." *Id.* (quotation marks omitted). The "manifest injustice" inquiry turns on several factors:

> (1) Whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.* (quoting *NLRB v. Wayne Transp.*, 776 F.2d 745, 751 n.8 (7th Cir. 1985)). "Like most such unweighted multi-factor lists, this one serves best as a heuristic; no one consideration trumps the others." *Id.*

The first factor—whether the case is one of "first impression"—requires some clarification. As we've noted, when an agency announces a new rule in the exercise of its adjudicative function, it may apply the rule in the proceeding before it; that is the case of "first impression." *Id.* This case, however, is one of "second impression": the BIA applied *Thomas* retroactively to Zaragoza—a stranger to the case in which the new rule was announced—even though she had already acquired a right to relief from removal by operation of the prior rule of *Cota-Vargas*. The government concedes, and we agree, that this factor tips against retroactive application.

The second factor is whether the new rule constitutes an abrupt departure from well-established practice or merely fills a void. *Thomas* overruled *Cota-Vargas* and therefore departed from well-established practice, so this factor too disfavors retroactive application.

The third factor is the extent of Zaragoza's reliance interests. Though no one factor in the *Velásquez-García* list is decisive, this one has a significant role to play. *See Vartelas*, 566 U.S. at 274 ("[T]he likelihood of reliance on prior law strengthens the case for reading a newly enacted law prospectively."); *Landgraf*, 511 U.S. at 270 (retroactivity doctrine is guided by "familiar considerations of fair notice, reasonable reliance, and settled expectations"). "Importantly, the critical question is not whether a party actually relied on the old law, but whether such reliance would have been reasonable." *Velásquez-García*, 760 F.3d at 582; *see also Jeudy*, 768 F.3d at 604.

Reliance on the old law was objectively reasonable in the circumstances here. Under the rule of *Cota-Vargas*, Zaragoza had clear right to relief under the petty-offense exception when the state court modified her sentence. That is, *Cota-Vargas* gave her a complete defense to removal once she obtained the order from the state court reducing her sentence to six months or less. When she did so, she reasonably relied on then-existing law, which lifted the inadmissibility bar and eliminated the basis for her removal.

The reliance interests here are arguably stronger than those at issue in *Velásquez-García*. There, the immigrant took preliminary steps toward acquiring permanent-resident status but did not file an application within one year of the date when his visa number became available, as required by

statute. *Velásquez-García*, 760 F.3d at 574. Under three prior non-precedential BIA decisions, the agency required an applicant to show only that he "took 'substantial steps' to acquire permanent status in order to qualify for the Act's protection." *Id.* at 576. However, in its intervening decision in *Matter of Vazquez*, 25 I. & N. Dec. 817 (B.I.A. 2012), the BIA narrowed its interpretation of the operative language in the statutory deadline, requiring "an immigrant [to] make a fully compliant application for permanent residence or one with only technical defects within one year, unless exceptional circumstances prevented the immigrant from filing such an application." *Velásquez-García*, 760 F.3d 576. In other words, "substantial steps" were no longer sufficient; under the new interpretation, a completed, compliant, and timely application was needed. The BIA's new interpretation "departed sharply" from its earlier non-precedential decisions. *Id.* We held that Velásquez-García's reliance on the old law was objectively reasonable because "[i]n light of the state of the law at the critical time, a reasonable person reasonably could have assumed that the Act did not require him or her to file an application within one year." *Id.* at 583.

If it was reasonable for Velásquez-García to rely on non-precedential BIA decisions generously interpreting a statutory deadline to apply for immigration benefits, then it was reasonable for Zaragoza to rely on the BIA's precedential decision in *Cota-Vargas*, which gave her a complete defense to removability based on her sentence modification.

The fourth factor is the degree of burden that the retroactive rule imposes. "Courts have long recognized the obvious hardship imposed by removal." *Id.* at 584. This factor clearly favors Zaragoza. The final factor is the statutory interest in

applying the new rule despite reliance on the old standard. "Often, this will point in favor of the government because non-retroactivity impairs the uniformity of a statutory scheme, and the importance of uniformity in immigration law is well established." *Id.* (quotation marks and alteration omitted). Applying *Thomas* to Zaragoza would promote uniformity because the rule would apply to all sentence modifications occurring before that decision was issued.

In sum, all but one of the *Velásquez-García* factors weigh against retroactive application of *Thomas* in Zaragoza's case. Accordingly, we conclude that applying the new rule to her would work a manifest injustice. We GRANT the petitions for review and REMAND to the BIA for further proceedings consistent with this opinion.